# CHARLESTON.

SMITH *et als. v.* LINDEN OIL Co. *et al.*

Submitted June 7, 1909. Decided March 14, 1911.

1.   MINES AND MINERALS—*Conflicting Claims to Royalty Oil—Jurisdiction*
     Equity has jurisdiction to pass on conflicting claims to royalty oil, though under the same lease. (p. 61).

2.  APPEAL AND ERROR—*Harmless Error—Overruling Demurrer*.
    Though a demurrer to a bill for want of parties be erroneously overruled, yet if they be later made parties by amended bill, the error is cured.  (p. 61).

3.  CARRIERS—*Carriage of Goods—Duty to Yield Possession to Person Having Title*.
    A common carrier of goods must yield possession or recognize the right of a third party having a true title, or such party may enforce his right by suit.  (p. 62).

4.  SAME—*Carriage of Oil—Liability of Pipe Line Company for Royalty Oil*.
    A lease for oil provides that the lessee shall pay the landowner a royalty of a fraction of the oil produced under the lease, such royalty oil to be delivered into the pipe line of a common carrier of oil. Such common carrier having notice of the assignment by the landowner to another of a given fraction of such royalty oil must account to such an assignee for his undivided fraction of such oil.  (p. 63).

5.  EQUITY—*Conclusiveness—Matters Concluded*.
    In a suit by an assignee of a fraction of the one-eighth for royalty reserved in a lease of land for oil to vindicate his right among conflicting claimants to a portion of such royalty oil, no decree can be made in favor of a claimant to another fraction of such royalty oil, he not asking it. It is foreign to the suit.  (p. 64).

6.  CARRIERS—*Pipe Line Companies—Duty of Company to Account for Undivided Fraction of Oil*.
    Where a lease for oil provides for the delivery to the lessor of a fraction of the oil in the pipe line of a common carrier of oil, there need be no actual physical separation of the lessor's share from the whole of the oil to vest title in him, but the carrier must account to him for his undivided fraction.  (p. 63).

Appeal from Circuit Court, Tyler County.

Suit by G. D. Smith and others against the Linden Oil Company, the Eureka Pipe Line Company, and others. From the decree the Eureka Pipe Line Company appeals.

*Affirmed in part.  Reversed in part.*

*A. B. Fleming, Charles Powell,* and *Kemble White,* for appellant.

*J. V. Blair, G. D. Smith,* and *I. M. Underwood,* for appellees.

BRANNON, JUDGE:

On 24th December, 1898, T. K. Harter and wife made a lease for development of oil and gas to W. S. Miller, trustee, of a tract of 51 acres of land, which lease Miller assigned to the Linden Oil Company. The lease bound the lessee to pay to the lessor Harter a royalty of one-eighth of oil produced, and "to deliver the same free of expense, into tanks or pipe lines to the credit of the party of the first part." On the 12th October, 1900, by deed recorded 13th October, 1900, Harter and wife conveyed to G. M. Smith and I. M. Underwood the undivided thirty-second of the oil that should be produced from the "two first" wells that should be drilled on the land under said lease, for a consideration of $100, and for deferred consideration specified. This conveyance was recorded, and of it the Linden Oil Company and the Eureka Pipe Line Company had notice. When this conveyance of part of Harter's one-eighth royalty oil was made no well had been drilled. Later the Linden Oil Company drilled wells producing much oil, two of those wells being known in this suit as Harter Well No 1 and Harter Well No. 2. These are the wells in whose oil Smith and Underwood claim a thirty-second interest. This oil was run into the pipe line of the Eureka Pipe Line Company, a common carrier. By deed 13th October, 1900, T. K. Harter and wife conveyed to Foster Mitchell one-half the oil in said tract subject to said Miller lease, this deed declaring its intent to be to convey to Mitchell one-sixteenth of the oil, that is, half the one-eighth royalty oil reserved by lease to Harter. This conveyance was recorded 18th October, 1900. Mitchell conveyed various interests in the oil conveyed to him by Harter to D. Daily, C. Melick and H. E. Wilson. Harter and wife conveyed to W. R. Fitch one sixty-fourth of the oil in said tract. It was discovered that though Harter and wife leased to Miller the entire tract, Harter owned only three undivided fifths, the remaining two-fifths being owned by George V. Harter and Rebecca J. Harter; and Harter conceding want of title to two-fifths made an agreement with the Linden Oil Company modifying the lease from Harter to Miller, so that the royalty, instead of the usual one-eighth as therein provided, should be three-fortieths, that is, three-fifths of one-eighth. The Linden Oil Company took a lease from George and Rebecca

Harter for their two-fifths. It seems not necessary to make this statement as to the modification of the Miller lease, as Harter's three-fortieths of the oil is more than the one thirty-second of oil assigned by him to Smith and Underwood.

The conveyance by T. K. Harter of the one thirty-second of the oil is prior in date and prior in recordation to the conveyance of interests in the oil made by Harter to Mitchell and Fitch. The conveyances of fractions of the oil by Harter to Smith and Underwood, and to Mitchell and to Fitch exceed the three-fifths of the one-eighth royalty oil going to Harter as lessor under his lease to Miller. Smith and Underwood notified the Eureka Pipe Line Company of their right to the one thirty-second of the oil in the two wells first to be drilled, and requested that no oil be sold from said farm until proper division orders should be made; and a second time notified the company not to sell oil until their interest or share be set apart, and required the company to render monthly statements of oil coming from those two wells.

When oil came the Linden Company gave no direction to the Pipe Line Company to account to Smith and Underwood for any share in the oil, and the Pipe Line Company would not recognize their right, but refused, alleging conflicting claim, and Smith and Underwood brought this chancery suit praying that the Linden Oil Company be compelled to turn over and deliver to them their share of the oil from those two wells, and make division orders recognizing their right to one thirty-second of the oil so that it might be sold, and that the Pipe Line Company render a true account of the oil run into its pipes from those wells; that a full account be had of such oil as against both companies; that the Pipe Line Company be required to show what disposition had been made of such oil, whether sold or not, and what the proceeds; that a decree be made declaring the one thirty-second of the oil produced from those wells, or to be produced, to be the property of Smith and Underwood, and that the companies be required to deliver to the plaintiffs their share of the oil. A decree was made declaring Smith and Underwood owners of one thirty-second of all oil produced from said two wells, and that it had not been accounted for, and that it had been run into the pipes of the Pipe Line Company as a

common carrier of oil; that three-fortieths of the oil from the two wells was going to Harter, and that out of such three-fortieths one thirty-second of all the oil should be set apart and delivered to Smith and Underwood. This decree also declared that the oil produced should be divided by the Eureka Pipe Line Company, as follows: to Smith and Underwood 5/160 royalty oil; to T. K. Harter 7/160 royalty oil; to George V. Harter 8/160 royalty oil, and to Linden Oil Company 7/8 working interest. The decree referred the case to a commissioner to report the oil from the two wells, and the daily production. The commissioner made a report, which was confirmed without exception by a later decree, holding that the total production was 15,365.68 barrels, and that 7/8 of it, known as the working interest, 13,444.97 barrels was the property of the Linden Oil Company; 480.17 barrels to Smith and Underwood; 672.25 barrels to T. K. Harter; 768.29 barrels to George V. Harter. It held that the oil of Smith and Underwood had been unlawfully detained from them, and required the Eureka Pipe Line Company to forthwith deliver to them said 480.17 barrels of oil, and place the same to their credit subject to sale by them, free of storage charges. And the decree required delivery to T. K. Harter of 7/160 of the oil. The Eureka Pipe Line Company alone appeals.

The question of equity jurisdiction is raised. There can be no question here. The case is one presenting conflicting claims to royalty oil, and we have held for equity jurisdiction in such case. *Peterson* v. *Hall,* 57 W. Va. 535; *Swearingen* v. *Steers,* 49 *Id.* 312.

It seems not worthy of mention that the court overruled a demurrer to the first bill based on the absence of T. K. Harter and wife as parties, since they were made parties by an amended bill, thus curing this error, if error.

A complaint is made that the decree required the Pipe Line Company to make discovery of the oil run into its line when no officer of it was made a party capable of making discovery. This is answered by the fact that the company filed a statement of such oil, which formed the basis of the decree. The law does require that some officer be made a defendant when discovery is required, as a corporation discovers by an officer;

it is a means of discovery for the plaintiff's benefit; but when the corporation does make the discovery, and it is accepted, where is the error?

It is pressed upon us strenuously that the Eureka Pipe Line Company is a common carrier; that it knows not Smith and Underwood or their rights, having no contract with them; that it contracted only with the Linden Company to receive its oil, and that Smith and Underwood must look to Harter and the Linden Company. This is a claim of non-accountability by the Pipe Line Company to the true owner of the oil; a claim that a common carrier knows only the consignor and consignee, and cannot be called on by a third party, having true title to the goods, to recognize this right. But the authorities do not bear out this position. The carrier is bound to respond to the demand of the real owner for possession of his goods, and in so doing does not render himself liable to one who, having wrongfully obtained possession, has delivered them to the carrier for transportation. "The real owner may maintain an action against the carrier for refusal to deliver goods to which he is entitled." 6 Cyc. 471. So say Moore on Carriers, 155 and 2 Hutchinson on Carriers, section 749. The lessee in this lease stipulated to deliver the royalty oil into the pipe line to the credit of Harter. When that oil got into the pipe line it was the property of Smith and Underwood. It was by extraction made personal property, and belonged to them. It cannot be that simply because it was in the pipes, it was beyond the reach of the true owners. Generally the true owner can get his goods. I do not see that their presence in the line took away the efficacy of the superior title, or had any peculiar virtue to absolve the carrier from accountability. The fact that the premises were in the possession of the Linden Oil Company is urged as being the sole test to show that the Pipe Line Company was not bound to look further, but only to receive from it, without liability to the true owner. For this we are cited *Griffin* v. *South West Pipe Lines,* 172 Pa. St. 580. That case will not support the possession. There the producing land was in adverse possession of one, and the pipe line company received oil from him, and another claimant of the land sued the company for the value of the oil, and it was held that *trover* and conversion or *assumpsit* will not lie

for a third party for oil coming from land in adverse possession. Land title cannot be so tried. The adversary title was the point denying the action.

Counsel tell us that an oil lease providing for royalty is like an agricultural lease; that the royalty is like a share of a grain crop to be paid the landlord, and that title remains in the landlord until he divides the grain and separates the landlord's part, and Harter and those under him have no title to sustain suit until the oil is separated. Now, all the oil is run into the pipe line. The lease in terms says that the royalty shall be delivered into the pipe "to the credit of the party of the first part." It provides no separate delivery, but for running the oil as a whole into the pipes. This peculiar provision distinguishes it from an agricultural lease. Delivery to the pipe line was a separation, going to the credit of the lessor gave him title.

Counsel make the point that the lease provides royalty, and the lessee had a right to pay to one hand, and cannot be called upon to split it into parts, and assign to each his part. We do not see that this is so. Why can not the company give each credit for his share?

It is said that the carrier cannot tell just what oil comes from each well; that other wells might deposit in the tank. Oil companies have a means of telling this, and it seems that no other wells poured into these tanks. Anyhow the Pipe Line Company did file a statement of the production from each well; which was accepted and acted on as the basis of the commissioner's report. There was no exception to it. It does not, under these circumstances, lie with the appellant to find fault in this, when the fact that it kept record from which it filed this statement shows, not only that it was in its power to ascertain what the output of each well was, but that it did so ascertain. Fault is found by counsel in the fact that the commissioner made his report of output of oil from the statement filed by the company. The company filed it as a discovery; it was its own evidence. Besides, there was no exception to the report on this score.

Complaint is made that no storage charge was made. Its amount does not appear. But could the defendant unlawfully

hold against Smith and Underwood, the true owners, deny their right and charge storage?

It is assigned for error that the decree gives oil to T. K. Harter. We think this assignment valid. Harter, after. conveying one thirty-second of the oil to Smith and Underwood, conveyed interests in the oil to Mitchell and Fitch, and these conveyances having been cancelled by decree in another suit, the court in this suit held that those interests reverted to Harter, and hence decreed him 672.75 barrels in oil produced and declared that he retained a certain fractional interest in the two wells. This suit cannot be held to be a partition or lien suit to settle the rights of defendants *inter sese.* It is a suit brought to vindicate the rights of Smith and Underwood against the oil company, the pipe line company and adverse claimants to oil. The relief given Harter does not grow out of relief administered the plaintiffs. Harter filed no answer, asked for nothing. This decree would prejudice the right of the pipe line company as between it and Harter about a matter not cognizable in this suit.

The decree gave a money recovery to T. K. Harter against Smith and Underwood for $295.00, for the deferred purchase money for the assignment by Harter to Smith and Underwood of one thirty-second of the oil. That is not involved in this suit. Harter did not by answer claim it, if he could have done so. This money is recoverable at law. Smith and Underwood cross-assign this as error. This decree for money does not grow out of relief administered the plaintiffs and the corporations.

We reverse the two decrees so far as they decree oil to T. K. Harter, and so far as the decree of 12th November, 1908, decrees $295.00 to Harter against Smith and Underwood, without prejudice to Harter touching those matters, and in other respects we affirm the decrees.

*Affirmed in part.    Reversed in part.*