SHREVEPORT-EL DORADO PIPE LINE COMPANY v. BENNETT.

Opinion delivered January 31, 1927.

1. MINES AND MINERALS—RESERVATION IN OIL LEASE.—A provision in an oil and gas lease requiring the lessee to deliver to the credit of the lessor one-eighth of the oil produced and saved is a reservation of title in the lessor, and not a mere covenant to pay rent in kind, as affecting the lessor's right to recover against the lessee's vendee for conversion.

2. MINES AND MINERALS—NOTICE OF RESERVATION IN OIL LEASE.— Where a pipe line company purchased oil from a lessee, it was

charged with notice of the lessor's reservation of title to one-eighth of the oil, and is liable for conversion thereof.

3.  MINES AND MINERALS—NATURE OF OIL.—Oil, before it is severed, is a part of the land, but after severance is personal property.

Appeal from Union Chancery Court, Second Division; *George M. LeCroy*, Chancellor; affirmed.

*Patterson & Rector* and *Powell, Smead & Knox*, for appellant.

*Mahony, Yocum & Saye*, for appellee.

MEHAFFY, J.   The plaintiffs brought suit in the Ouachita Circuit Court, alleging that Henry C. Cates was the owner of the south half of the northwest quarter of the southwest quarter of section 33, township 18 south, range 15 west, Union County, Arkansas, which was subject to an oil and gas lease in favor of the G. S. & G. Corporation; that Cates was the owner of one-eighth royalty interest in and to the oil produced and severed from said tract of land; that the G. S. & G. Corporation, from November 21 to March 22, sold and delivered to the defendant numbers of barrels of oil for the total price of $135,924.31, of which sum the plaintiff, Henry Cates, was entitled to $16,990.54; that the defendant had paid Cates one-half this sum and owed him $8,495.26, which was past due; that Henry C. Cates had assigned and transferred to the plaintiff, Harlan Bennett, his interest and claim to said money.

The defendant, Shreveport-El Dorado Pipe Line Company, Incorporated, denied that Cates was the owner of the land and entitled to receive royalty of one-eighth of the oil, and denies that it received the oil from the G. S. & G. Corporation, as alleged in the complaint; denied that it had paid Cates any sum whatever on account of oil purchased from the land described. Defendant, by way of cross-complaint, alleged that it purchased oil from the G. S. & G. Corporation, which was delivered to it on the southwest quarter of the southwest quarter of section 33, township 18 south, range 15 west, and paid Henry Cates one-sixteenth royalty interest; that this payment was made in pursuance to a division order executed

by Henry C. Cates, in which division it was alleged that Cates agreed that this was his only interest. Defendant further alleged that, at the same time, it paid to Cordell, Swilley and Cobb the other one-sixteenth; that, by the terms of the division order, the title to the oil purchased by the defendant was guaranteed, and the defendant made payments to the parties other than Cates, in accordance with the division of interest as shown by said division order; defendant asked that Cordell, Swilley and Cobb be made parties to the action, and that defendant have judgment against them in case plaintiff obtained judgment against it. The case was transferred to equity.

Cordell, Swilley and Cobb filed separate answer. Defendant filed an amendment to its answer, denying that the plaintiff, Cates, was the owner of any oil severed from the lands, but alleged that the G. S. & G. Corporation, under the terms of the lease, was the owner of all oil produced and severed from the soil, and that, if any oil which defendant ran was in fact produced and severed from land described in plaintiff's complaint, it was purchased by this defendant from the G. S. & G. Corporation, which failed and refused to run any part of said oil to the credit of the plaintiff, Henry Cates, except one-sixteenth, for which payment had been made to plaintiff. Defendant says it had no knowledge that plaintiff was entitled to receive any royalty on any part of the oil purchased by it from the G. S. & G. Corporation, except an undivided one-sixteenth, and, if plaintiff had failed to receive what was due him, it was caused by breach of the contract existing between plaintiff and G. S. & G. Corporation, and not the fault on the part of defendant, and was caused by the carelessness of plaintiff in failing to notify defendant about the division order. Defendant alleged that all oil purchased by it was purchased under the division order referred to in the original answer, which was signed by the plaintiff, Cates, and that said division order authorized said defendant to pay to Cordell, Swilley and Cobb one-sixteenth; that, if part of the oil purchased by the defendant, of which Cates was entitled to one-eighth,

was delivered to Cordell, Swilley and Cobb, he and his co-plaintiff, Bennett, knew the fact, and knew that said oil was being run under said division order, and they allowed and permitted defendant to make payment in accordance with said division order, and, by their failure to object and call defendant's attention to the fact that the oil was being produced from lands where the plaintiff was entitled to receive and collect one-eighth, they are estopped to insist that defendant be required to pay them. That, if plaintiff has any right of action, it is against the G. S. & G. Corporation. The court found in favor of the plaintiff against the Shreveport-El Dorado Pipe Line Company, Incorporated, and found in favor of the Shreveport-El Dorado Pipe Line Company, Incorporated, against cross-defendants, Cordell, Swilley and Cobb, finding the amount due each.

The lease passed to the G. S. & G. Corporation, in so far as sixty acres of the land is concerned, and, in discussing the issues and the case, the attorneys have referred to the land as the south forty and the north twenty. The lease is the usual oil and gas lease by Cates and his wife of the land described, for the sole and only purpose of mining and operating for oil and gas, laying pipe lines, etc. After a description of the land and the statement as to the term it is to remain in force, it is stated: "In consideration of the premises the said lessee covenants, (1) to deliver to the credit of lessor, free of cost, in the pipe line to which he may connect his wells, the equal one-eighth part of the oil produced and saved from said leased premises." The above is the important section involved in this suit, because the main contention of appellant is that the lessee became the owner of all the oil and gas, and that the one-eighth was merely paid as rental. Another clause of the lease provided:

"If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors or assigns, but no change in the ownership of the land or assignment of

rentals or royalties shall be binding on the lessee until the lessee has been furnished with a written transfer or assignment or a true copy thereof; and it is hereby agreed that, in the event this lease shall be assigned as a part or as to parts of said above described lands, and the assignee or assignees of such part or parts shall fail or make default in the payment of the proportional part of the lands due from him or them, such default shall not operate to defeat or affect this lease in so far as it covers a part or parts of said lands upon which said lessee or any assignee thereof shall make due payment of said rentals.''

The last quoted clause is also important, because of the contentions of the different parties.

On December 17, 1921, the parties interested signed a division order directed to the Shreveport-El Dorado Pipe Line Company, Incorporated, in which they stated that they certified and guaranteed that they were the legal owners of the wells on the south forty and that they are entitled to the entirety of the oil produced from said well, including the royalty and interest, until further written notice. The Shreveport-El Dorado Pipe Line Company, Incorporated, was to give credit for all oils received from said wells as per directions below. Then the directions were to give Henry C. Cates one-sixteenth, the G. S. & G. Corporation seven-eighths. This letter or division order was signed by the G. S. & G. Corporation, Henry Cates, John A. Cobb, J. C. Swilley, treasurer, and R. M. Cordell.

It is unnecessary to set out the testimony in full or at length. The real contention is largely a question as to the law. That portion of the testimony necessary to be discussed will be set out later.

The appellant's first contention is that, under the terms of the lease, the title to all the oil from the land covered by the lease vested in the lessee and his assigns as and when it was produced and severed from the soil, and that the stipulation in the lease for the delivery of one-eighth of all the oil produced to the pipe line to the

credit of the lessor was a covenant by the lessee to pay rent in kind, and was not a reservation of title in the lessor as to such one-eighth. We do not agree with the contention of appellant that this is true.

Appellant's attorneys call attention to a number of cases decided by this court to the effect that, when the oil or gas is taken from the ground and placed in the pipe line, it becomes the personal property of the plaintiff, just like any other personalty owned by it, but, even in those cases referred to, the question now before the court was not under consideration, and we do not think the authorities of this court cited by appellant support its contention.

The evidence shows that the pipe line company had knowledge of the provisions of the lease, and the provisions of the lease advised it that the appellee owned one-eighth of the oil on the south forty and the north twenty. About this there is no dispute. The division order expressly states that the persons signing it are the legal owners and entitled to the entirety of the production from said wells, including the royalty interest. Therefore, when appellant examined the lease, it was bound to know that one-eighth of the oil which went into its pipe line, under the terms of the lease, belonged to the appellee. When it received the division order, it showed on its face that it applied to the south forty alone. It therefore had knowledge that, under the terms of the lease, the appellee owned one-eighth, and from the division order it knew that he had sold a portion of his royalty on the south forty alone. Therefore, whether the lessee became the sole owner or not would seem to be immaterial, because, when the appellant received the oil into its pipe line, it knew that the appellee was entitled originally to one-eighth on both tracts of land, and knew that he had only sold a portion of that on the south forty. It therefore follows that, when the appellant received oil which came from the north twenty, it was its duty to deliver it according to the terms of the lease, unless it had received a division order as to the oil from this north twenty.

It was said by the West Virginia court: "A complaint is made that the decree required the pipe-line company to make discovery of the oil run into this line, when no officer of it was made a party capable of making discovery. This is answered by the fact that the company filed a statement of such oil which formed the basis of a decree. The law does not require that some officer be made a defendant when discovery is required, as a corporation discovers by an officer; it is a means of discovery for the plaintiff's benefit, but, when the corporation does make the discovery and it is accepted, where is the error?" *Smith* v. *Linden Oil Co.,* 69 W. Va. 57, 71 S. E. 167.

It was also said in the above case:

"That the pipe line company was a common carrier; * * * that it contracted only with the Linden Company to receive its oil, and that parties must look to Harter and the Linden Company. This is a claim of nonaccountability by the pipe-line company to the true owner of the oil; a claim that a common carrier knows only the consignor and consignee, and cannot be called on by a third party, having true title to the goods, to recognize this right. But the authorities do not bear out this position. The carrier is bound to respond to the demand of the real owner for possession of his goods, and, in so doing, does not render himself liable to one who, having wrongfully obtained possession, has delivered them to the carrier for transportation. The real owner may maintain an action against the carrier for refusal to deliver goods to which he is entitled. * * * The lessee in this lease stipulated to deliver the royalty oil into the pipe line to the credit of Harter. When that oil got into the pipe line, it was the property of Smith and Underwood. It was by extraction made personal property, and belonged to them. It cannot be that, simply because it was in the pipes, it was beyond the reach of the true owners."

Again, the court said in the same case:

"The fact that the premises were in the possession of the Linden Company is urged as being the sole test to

show that the pipe-line company was not bound to look further, but only to receive from it without liability to the true owner."

The court also said:

"Counsel tell us that an oil lease providing for royalty is like an agricultural lease; that the royalty is like a share of a grain crop to be paid the landlord; and that title remains in the landlord until he divides the grain and separates the landlord's part, and Harter and those under him have no title to sustain suit until the oil is separated. Now, all the oil is run into the pipe line. The lease in terms says that the royalty shall be delivered into the pipe to the credit of the party of the first part. It provides no separate delivery, but for running the oil as a whole into the pipes. This peculiar provision distinguishes it from an agricultural lease. Delivery to the pipe line was a separation going to the credit of the lessor, giving him title."

We think the decision of the West Virginia court is a complete answer to appellant's argument as to the ownership of the one-eighth interest; but, in addition to the fact that the lease itself showed that the appellee was entitled to the one-eighth, the division order expressly states that the persons signing it are the owners of all the oil. There is no controversy about the fact that oil, before it is severed, is a part of the land, and, when it becomes severed, it is personal property, but it is earnestly argued that it is not only personal property but it is the property of the person who severs it, that is, the property of the lessee. The facts in this case, the lease and the division order, show that a portion of it is the property of the lessor. It is just as much his property under the facts in this case as it would be if he had simply employed the lessee as his servant to do the work and bring it to the surface. In fact, one might employ an agent or servant to bring oil to the surface with the agreement and understanding that, when it was brought to the surface, it should be delivered into a pipe line, a certain portion of it to the employer or landowner and a certain portion of

it to the person who severed the oil. It therefore seems clear that one-eighth of the oil on the twenty acres was the property of the appellee, but we also think that, even if it were the payment of rent in kind, when the one-eighth together with the other seven-eighths was delivered into the pipe line, all together, the appellant was bound to know that one-eighth of it was to be paid to the lessor.

In the case of *Nonamaker* v. *Amos,* 73 Ohio St. 163, 76 N. E. 949, from which the appellant quotes at length, it will be observed that one contention in that case was that a parol contract related to an interest in land, and that it was not to be performed in a year. These were the issues, but it was said in that case:

"This is the lessor's compensation for the lease and rights granted therein. The five-sixths go to the lessees by virtue of the same instrument, because the grant to them was the oil contained in the premises."

So, it seems from that case that the lessor was regarded as the owner. To be sure, it says that the oil becomes personal property and belongs to the owner of the well. That simply means that it belongs to the parties whose interests are shown in the lease and the division order. Other cases referred to hold that the one-eighth is given as a consideration for the grant, and that it was not a reservation in any sense of any part of the gas or oil in place in the land. Of course, it did not become personal property until severed from the land, and the lessee himself had no interest in the soil and no interest in the land except the right given him by the lease as to the gas and oil.

Appellant next contends that, because the title is in the lessee when the oil is severed, an action will not lie by the lessor against the lessee's vendee for conversion. We have already held that the title to the one-eighth is not in the lessee, and certainly, when delivered in the pipe line, one-eighth of it was the property of the lessor.

It is next contended by appellant that appellees are estopped to recover from the appellant by the execution

of the division order which sets forth the interest of Cates as one-sixteenth. Defendants argue that they had no notice. We have already shown that they had knowledge of the lease, which showed one-eighth to belong to the lessor, and that the division order was confined to the south forty.

They next argue that the appellees are estopped by the failure to call appellant's attention to the fact that it was paying royalties to other parties, which should have been paid to Cates. What we have already said about the notice and knowledge of appellant disposes of this question.

The evidence is sufficient to justify a decree in favor of appellees against appellant, and also in favor of appellant against Cordell, Swilley and Cobb. The decree of the chancery court is therefore affirmed.