Peggie Payne PEEK *v.* SIMMONS FIRST NATIONAL
BANK, as Successor Trustee of the Testamentary Trust
Under the Will of W.I. Payne

91-347                                              832 S.W.2d 458

Supreme Court of Arkansas
Opinion delivered May 11, 1992
[Rehearing denied June 1, 1992.]

*Jones & Petty*, by: *John Harris Jones*, for appellant.

*Ramsay, Bridgforth, Harrelson & Starling*, by: *Phillip A. Raley* and *F. Daniel Harrelson*, for appellee.

ROBERT H. DUDLEY, Justice. The will of W.I. Payne was probated in 1942, and, upon discharge in probate, the assets of the estate were transferred to a testamentary trust that, ever since, has been in administration. Under the terms of the trust, the assets are now to be distributed to the beneficiaries. The successor trustee, appellee Simmons First National Bank, proposed a plan of distribution to which one of the beneficiaries, appellant Peggie Payne Peek, objected. The chancery court approved the proposed distribution, and appellant appeals. We affirm the chancellor's ruling.

The probated will bequeathed cash sums to various beneficiaries, to be paid immediately, and then bequeathed and devised "all the rest and residue of my estate" to John Collins and R.P. Crayton in trust for specified purposes. The trustees were given full power to sell any of the assets of the trust upon such terms as they saw fit and were authorized to invest any of the funds of the trust in any security they deemed appropriate.

The trust had three purposes. First, the trustees were directed to pay $500.00 per month to the testator's widow, Nora Burton Payne, for so long as she should live, and at the same time to pay $200.00 per month to the testator's daughter, Lucille Payne Crayton. This apparently was done and is not at issue. Second, upon the death of the widow, the trustees were directed to pay all of the net income of the estate to the daughter, Lucille Payne Crayton, for "as long as she may live." The daughter, or the second life beneficiary, died on July 21, 1989. The payments to her apparently were made and are not at issue, but this leads to the third purpose and the one at issue in this case. The governing provisions are as follows:

Upon the death of my said daughter, after payment of

funeral expenses, expense incident to her last illness and for a suitable monument or marker for her grave out of the funds of my estate, my trustees are directed to make distribution of the *rest and residue* of my estate as follows, to-wit:

(a) I give, devise and bequeath one fourth (1/4th) of my said estate to my granddaughter, Peggy Payne Crayton, if living, and to her issue, if any, if not living, *and direct my trustees to set aside one fourth in value of my said estate*, my trustees being the *sole judge as to what constitutes one fourth of the value of said estate.* If my granddaughter, Peggy Payne Crayton, has not arrived at the age of twenty five years, then my trustees are to continue to handle *whatever she would receive* under this bequest, using the income for her maintenance, benefit, support and education, with the privilege and discretion of using all or any part of the principal, if the income is deemed insufficient, as in their discretion may be deemed necessary or advisable, my said trustees to have like authority and powers as are conferred upon them hereinabove for the handling of my estate until she shall arrive at the age of twenty five years. Upon her arrival at the age of twenty five years, my said trustees shall pay, transfer, convey, assign and/or set over to the said Peggy Payne Crayton the *balance of the trust estate* held by them under this provision. . . .

. . . .

(c)    *After one fourth of my estate has been set aside* for my granddaughter, Peggy Payne Crayton, as provided in Section (a) . . . my trustees are authorized, ordered and directed to sell and dispose of the remainder of my estate at such price and upon such terms as in their absolute and uncontrolled discretion is deemed advisable. . . .

. . . .

Sixth:    My . . . trustees are authorized to continue carrying on my farming operations in a manner similar to the way I am now carrying on same, or they may, at any time, in their discretion, sell all or a part of my live stock, farming implements, equipment, etc. used in connection with my

farming operations and rent, lease, let or *sell all or a part of said land to others at such rentals or price as, in the opinion of my . . . trustees, seems advisable.*

Seventh: In the event of the death, resignation or inability of R.P. Crayton to act as a trustee, then John Collins shall act as sole trustee. In the event of the death, resignation or inability of John Collins to act as a trustee, I hereby designate and appoint W. Herbert Collins, of Little Rock, Arkansas, to act as a substitute for the said John Collins, with like powers and authority as are conferred upon my trustees hereinabove named, the trustees of my said estate being required to furnish an adequate bond to be filed with the Chancery Clerk of Jefferson County, Arkansas. [Emphasis added.]

The testamentary trust nominated John Collins and R.P. Crayton as trustees with W. Herbert Collins to be a substitute trustee for John Collins. In 1944 John Collins and W. Herbert Collins resigned as trustees, and R.P. Crayton began serving as sole trustee. R.P. Crayton died in 1954, and the chancery court appointed A.R. Merritt and J.E. Crayton substitute trustees. J.E. Crayton resigned in 1956, and A.R. Merritt served as the sole trustee until his death in 1976. At that time appellee Simmons First National Bank assumed the role of successor trustee and has served since that time.

In 1990, after the death of the second life beneficiary, the appellee bank filed a petition in chancery court seeking instructions in carrying out its duties as successor trustee. The petition does not contain an inventory of the corpus of the trust, but a balance sheet dated December 31, 1989, reflects cash of about $171,000.00 and real estate, and the balance sheet at the end of 1990 reflects cash of about $116,000.00, a crop inventory of about $91,000.00, and real estate. Other instruments in the transcript show that the real estate consists of lots in the Pine Cone Division, several lots in Sherrill, some cemetery lots, and farmland. The farmland consists of fourteen tracts, a few being contiguous, spread over thirteen sections, and totaling 2,570 acres. The farmland contains an uneven distribution of soils, some having rich silt loam, some with clay, and some with both. Some of the tracts are very desirable, while others contain only marginal soils.

One hundred and fifteen acres are non-productive and 384 acres have a very low productivity with one forty-acre tract being described as "practically a lake bed." Only about 75% of the farmland consists of the "base acres" that are allotted by the Department of Agriculture's Agricultural Stabilization and Conservation Service. Some of the land is not irrigated and cannot be efficiently irrigated, and the improvements are not evenly distributed over the various tracts. The land is farmed in three separate operations by three different tenants who use large pieces of equipment. It is difficult and expensive to move the large pieces of equipment from one area to another. The value of all of the tracts of farmland together exceeds $2,000,000.00. The two salient facts pertinent to the successor trustee's petition for instruction are that the bulk of the corpus of the trust is the farmland and that the testator's granddaughter, appellant Peggie Payne Peek, is entitled to more than $500,000.00 in value of the assets of the trust.

In response to the successor trustee's petition for instruction, the chancellor appointed three commissioners to determine whether appellant's "one fourth in value" of the trust could be carved out of the farmland. The commissioners reported that one fourth in value could not be set aside from the farmland alone without adversely affecting the value of the remaining farmland. If the remaining farmland had a diminished value, the other ninety-six beneficiaries of the trust would not receive all they were entitled to receive. The successor trustee proposed setting aside to appellant 320 acres known as the "McKinney Road Place," appraised at $240,000.00, "with the remainder of such share to be distributed in cash following the sale by petitioner [successor trustee] of the remaining real property held by the trust." The testimony showed that the McKinney Road Place could be set aside without diminishing the value of the remaining tracts. There is a dispute over whether the appellant, through her husband, agreed to the successor trustee's proposal but, regardless of whether there was an agreement, the successor trustee advertised all of the land except the McKinney Road Place as being for sale. Appellant filed an objection to the proposed distribution. The chancellor approved setting aside the McKinney Road Place for appellant and the sale of the remainder of the land in order to terminate the trust. Appellant appeals from that

order.

▮ Appellant first argues that the chancellor erred in ruling that the successor trustee succeeded to the discretion to sell that was granted the original trustees. The italicized provisions of the testamentary trust, quoted earlier, show that under the "use" power and under the power granted in the paragraph labeled *Sixth*, the original trustees were authorized to sell any or all of the real estate at any time. Thus, the original trustees clearly could have sold the farmland in their sole discretion. The only issue is whether that power was conferred to the successor trustee. The general rule today is:

> [W]here the terms of the trust instrument are explicit, those terms are controlling. . . . Frequently, however, there is no express provision in the trust instrument. In such a case the question of the survival of powers depends upon what the settlor intended or what he probably would have intended if he had thought about the matter, the intention or probable intention being determined by the language of the trust instrument as interpreted in the light of all the circumstances. Ordinarily the inference is that he intended that the powers conferred on the trustee should survive. In other words, the rule is that powers survive unless the settlor manifested an intention that they should be exercised only by the trustee originally named.

3 Scott & Fratcher, *The Law of Trusts* § 196 (4th ed. 1988).

The Restatement provides: "The powers conferred upon a Trustee can properly be exercised by his Successors, unless it is otherwise provided by the terms of the trust." *Restatement (Second) of Trusts* § 196 (1959). In opposition to today's general rule, appellant cites us to a few older cases which hold that personal and discretionary powers of a trustee cannot exercised by a successor trustee, *see, e.g., Virginia Trust Co.* v. *Buford*, 123 Miss. 572, ͹5 So. 356 (1920), and also cites us to some of the language in the cases of *Moose* v. *Moose*, 271 Ark. 231, 608 S.W.2d 3 (1980), and *Gregory* v. *Moose*, 266 Ark. 926, 590 S.W.2d 665 (Ark. App. 1979). However, the appellant tacitly admits that the holdings of the Arkansas cases are not on point and that the older foreign cases are not in accord with the current trend. We are of the opinion that today's general rule, stated

above, contains the better reasoning. This case is a good example, for here it must have been apparent to the settlor that it would most likely take many years to accomplish the three purposes of the trust. The second life beneficiary of the trust was a relatively young woman whose child, the appellant, was only an infant. As it turned out, it took half of a century to accomplish the purposes. Surely, the settlor knew that over a potentially long period of time it was likely that the named trustees would be unable to serve for the duration of the trust. Yet, he did not indicate in any way that the powers of any successor trustee should be limited. The inference is that he intended that the powers conferred on the trustees should survive, and accordingly, we affirm the chancellor on this point.

■ There is an additional reason for affirmance on this point of appeal, and that is the chancery court approved the appellee successor trustee's plan of distribution. Thus, the plan was not dependent solely on the trustee's exercise of its discretionary power.

■ Appellant next argues that the plan of distribution is not in accord with the terms of the will. Her argument is that the trust instrument requires the trustee to "set aside" one-fourth of the value of the estate, or farmland, and only after that is done can the rest of the farmland be sold. However, the testamentary trust simply does not provide that appellant is to receive her one-fourth share in farmland. Rather, the "use" provision of the trust provides that the trustees "*have full power to sell and convey any part of all of the assets of the estate, including real property.*" The paragraph numbered *Sixth* provides that the trustees may continue the farming operation or may "rent, lease, let or *sell all or a part of said land* to others at such rentals or prices as, in the opinion of my . . . trustees, seems advisable." The trustees have had this power since 1942; it is not a power that came into being only upon the fulfilling of the second purpose in 1989. If they had so chosen, they could have sold all or any part of the farmland in 1950, or 1960, or any other year and could have taken the proceeds and invested them in bank certificates of deposit, stocks, bonds, or other similar investments. In providing for a delay in the distribution if appellant were not twenty-five years of age at the date of the death of the second life beneficiary, the settlor wrote that "then my trustees are to continue to handle *whatever she*

*would receive under this bequest*," and that "upon her arrival at the age of twenty five years, my said trustees shall pay, transfer, convey, assign and/or set over to the said Peggie Payne Crayton the *balance of the trust estate* held by them." There is no language to indicate that the trustees lost this power upon the death of the second life beneficiary, and we do not interpret the language "direct my trustees to set aside one fourth in value of my said estate, my trustees being the sole judge as to what constitutes one fourth of the value of said estate" to mean that the trustees were to lose the power of sale. In sum, when the testamentary trust is examined in its entirety, it is manifest that the settlor did not intend to limit the trustees to only setting aside one fourth of the farmland for the appellant, and the paramount principle in the interpretation of trusts is that the intention of the settlor governs. *Little Rock Univ.* v. *George W. Donaghey Foundation*, 252 Ark. 1148, 483 S.W.2d 230 (1972).

■ Appellant next argues that the successor trustee should be estopped from asserting its plan of distribution because it is contrary to an earlier plan submitted by the successor trustee. The argument is without merit because the successor trustee's plan is not contrary to its earlier plan. Even if it were, the appellant has not established that she relied to her detriment on the first plan. A party asserting estoppel must prove that in good faith he relied on some act or failure to act by the other party and, in reliance on that act, suffered some detriment. *Worth* v. *Civil Serv. Comm'n*, 294 Ark. 643, 646, 746 S.W.2d 364, 366 (1988).

■ Finally, appellant argues that the chancellor erred by refusing to allow her expenses of litigation, including attorney's fees. While we have allowed an award of attorney's fees when an action was successfully prosecuted against a trustee for breach of trust, *Liles* v. *Liles*, 289 Ark. 159, 711 S.W.2d 447 (1986), such is not the case at bar. Here, the successor trustee sought the aid of the chancery court in interpreting the trust instrument and in determining its duties. The chancellor did not abuse his discretion in refusing to award an attorney fee to appellant.

Affirmed.

GLAZE and BROWN, JJ., dissent.

ROBERT L. BROWN, Justice, dissenting. This case presents

the classic dispute between a settlor's express intent and the trustee's practical difficulty in complying with that intent. The majority has opted in favor of discarding the settlor's intent for a more pragmatic result due to the difficulty in carving out one-quarter of the Payne estate for the appellant. I would give credence to the settlor's directions and reverse the probate court's decision relating to distribution of the trust estate.

The Payne will is clear. W.I. Payne set up a testamentary trust for the residue of his estate and, as is standard, gave his trustees general fiduciary powers which included the power to continue to operate the farm and sell the assets of the trust estate. He then provided for the distribution of trust income until his wife and daughter died. Payne specifically and explicitly directed the distribution of the trust *res* following the deaths of his wife and daughter:

> (a)   I give, devise and bequeath one fourth (1/4th) of my said estate to my granddaughter, Peggy Payne Crayton, if living, and to her issue, if any, if not living, and direct my trustees to set aside one fourth in value of my said estate, my trustees being the sole judge as to what constitutes one fourth of the value of said estate.

> . . . .

> (c)   After one fourth of my estate has been set aside for my granddaughter, Peggy Payne Crayton, as provided in Section (a) and in event no child or children are born unto my daughter, Lucille Payne Crayton, my trustees are authorized, ordered and directed to sell and dispose of the remainder of my estate at such price and upon such terms as in their absolute and uncontrolled discretion is deemed advisable. . . .

I agree with the majority that the paramount principle in the interpretation of trusts is that the settlor's intent governs. *Little Rock Univ.* v. *George W. Donaghey Foundation*, 252 Ark. 1148, 483 S.W.2d 270 (1972). This court further has endorsed the age-old principle that words and sentences used in a testamentary trust must be reasonably construed in their ordinary sense to arrive at the intention of the settlor. *Fowler* v. *Hogue, Trustee*, 276 Ark. 416, 635 S.W.2d 274 (1982).

Here, Payne's directions for the distribution of the settlor's trust estate are exact. The fact that his testamentary trust also provided his trustees with a general power to sell land and administer her one-quarter share prior to age twenty-five does not diminish his directions for accomplishing the ultimate distribution of his estate. Four witnesses testified that the one-quarter interest could be set aside for the appellant. The settlor's intent should be honored.

I respectfully dissent.

GLAZE, J., joins.